1st JUDICIAL DISTRICT COURT FOR THE PARISH OF CADDO

STATE OF LOUISIANA

NO. 559,453    DIVISION "B"    SECTION:

MICHEAL GARDNER, individually and on behalf of his deceased father,
GERALD GARDNER, and ANTHONY L. GARDNER and OLIVIA GARDNER STANLEY

VERSUS

NEXION HEALTH AT PIERREMONT, INC. A/K/A PIERREMONT HEALTH CENTER

FILED:_____    _____
                                   DEPUTY CLERK

## PETITION FOR DAMAGES

NOW COME, MICHAEL GARDNER, individually and on behalf of his deceased father, GERALD GARDNER, and ANTHONY L. GARDNER, individually and OLIVIA GARDNER STANLEY, individually, collectively referred to as Petitioners, **wherein a Medical Review Panel rendered an opinion on February 6, 2012, and therefore:**

I.

### DEFENDANT

Named Defendant herein is:

A.  NEXION HEALTH AT PIERREMONT, INC., also known as and operating as and through PIERREMONT HEALTH CENTER, which at all times pertinent herein, engaged in the practice of medicine within the Parish of Caddo, State of Louisiana.

II.

2.01   GERALD GARDNER was a patient confined to PIERREMONT HEALTH CENTER (owned and/or operated by NEXION HEALTH AT PIERREMONT, INC.) beginning June, 2008.

2.02   GERALD GARDNER suffered needlessly and died prematurely as a proximate result of substandard medical care and treatment received at Defendant's PIERREMONT facility.

III.

### BACKGROUND

3.01   *Brentwood* Admission—**June, 2008.** Gerald Gardner received good and respectable care at the *Brentwood* facility in Shreveport from 6/19/2008 through 7/29/2008, during which he was treated for recurrent major depression.

3.02   On admission to *Brentwood*, Gerald Gardner was disheveled, unkempt and needed a bath. He walked with a shuffle and his affect was flat and blunted. He was also being treated for Parkinson's

Page 1 of 9


EXHIBIT A

disease, hypertension, hypercholesterolemia, and he was a non-insulin dependent diabetic. He was admitted to *Brentwood*'s Partial Hospitalization Program Senior Unit on 7/21/08 and it was advised that he go to an assisted living facility after discharge. During his stay at *Brentwood*, Dr. Lee Stevens placed Mr. Gardner on Pristiq (anti-depressant) and Namenda (to treat dementia).

3.03   Admission to *Pierremont*—July, 2008. Gerald Gardner was transferred from *Brentwood* to *Pierremont Healthcare Center* in Shreveport on July 29, 2008. He remained at *Pierremont* for about 6 months until his final discharge on January 11, 2009 (with intermittent discharges for hospitalization at other facilities).

3.04   On admission to *Pierremont*, Colonel Gardner was ambulating slowly but independently, could follow simple commands and had some moments of confusion. **He was evaluated level 3 (minimal) risk for falls, and had no history of falls.** He was evaluated and started on physical and occupational therapy.

3.05   August, 2008. During the month of August 2008, Gardner was seen at the *McFarland Clinic* by Dr. Zuriga. No significant changes were noted in his health status. He continued to be reported as being confused during the daytime hours with an unsteady gait and balance. He was taking 14 different medications, several of which were directed at treatment of his irritable bowel symptoms and constipation. He was also taking his antidepressant and medications to control his blood sugar levels and reduce his cholesterol levels.

3.06   Around the middle of August, he was discharged from physical therapy. He was felt to have reached a plateau and many times refused to participate in the therapy. **The staff noted the need to monitor skin issues due to the amount of time he spent in bed during each day.** They also noted that his balance had decreased since the time he was discharged from PT.

3.07   September, 2008. During the month of September, his bed mobility and ability to transfer himself and eat and drink independently fluctuated from total independence to limited assistance. He remained confused at times and continued with a weak and unsteady gait. On 9/9/08, he had a colonoscopy that was (+) for diverticulosis, but no evidence of cancer. No follow up for 5 years was necessary. He was noted be able to ambulate about the unit ad lib and required minimal to moderate assistance to perform activities of daily living (ADLs). Remeron (antidepressant) was added to his drug regimen. Many days, he was noted to stay in bed most of the day. PT was started again at the end of the month to work on his unsteady gait.

3.08  **October, 2008.** During October 2008, Gardner was noted at times to be alert, depressed and confused. His gait remained unsteady and weak. He, at times, refused PT and his meals. Dr. McFarland ordered Megace (appetite stimulant) to be added to medication regimen. On 10/8/08, his family visited at 4pm and was concerned that he would not open his eyes and appeared to be in a very deep sleep. He was lethargic and difficult to keep awake. The family requested that the Remeron be withheld since some of the side effects are drowsiness and confusion. It appears that the Remeron was not withheld and the family asked again on 10/10 that it be withheld until Dr. McFarland was notified. On 10/14/08, Dr. McFarland ordered the Remeron to be discontinued. On that same day, Mr. Gardner wandered out the front door and was re-directed back into the unit. On 10/15/08, it was noted that he had some lung congestion and he was encouraged to get out of bed more and move around more. He was seen by Dr. Okereka (podiatrist) for nail care on 10/16/08. Toward the end of the month, Mr. Gardner was evaluated and placed at a high risk for falls, and even though he was noted to wander aimlessly, he was not considered an elopement risk.

3.09  On 10/26/08, Mr. Gardner was noted to have an altered mental status and was not arousable. Dr. McFarland was notified and he was admitted to *Christus Schumpert Hospital*. A CT of the head was performed and showed diffuse central and cortical atrophy with changes of small vessel ischemia, but nothing acute. His EKG was normal. He was diagnosed with intravascular volume depletion (dehydration), treated with IV fluids and discharged.

3.10  **Return to *Pierremont*—October, 2008.** Colonel Gardner was returned to *Pierremont* on 10/27/08. On that evening, he was noted to be wandering down the hallway in his underwear, going into other resident's rooms, and urinating on the bathroom floor. Dr. McFarland was notified and "Wanderguard" was ordered to be placed on his ankle. Dr. McFarland also ordered for Gardner to be sent to Red River for evaluation and treatment of deep depression.

3.11  **November, 2008.** From 10/30/08 to 11/19/08, Gardner was at *Red River Behavioral Center* for increased agitation, depression and combativeness with staff at *Pierremont*. During the admission, his psychotropic drugs were adjusted and he gradually improved.

3.12  **Return to *Pierremont*—November, 2008.** Gerald Gardner was discharged back to *Pierremont* in a calm and cooperative state, although alert, confused and weak.

3.13  After his return to *Pierremont*, he was **noted to be incontinent and wearing adult diapers.** He was allowed to ambulate with assistance and move longer distances in his wheelchair by

himself. On 11/19/08, he was noted to "slide" out of his chair onto the floor and did not sustain an injury. Later that day, he was noted to go in and out of other rooms and a small gash was noted over the right side of his upper lip with blood on inside of his mouth. Somewhere between 3:50pm and midnight, the LVN informed the RN that Gardner had fallen and had a possible seizure. The RN did not note any deficits on her neuro assessment and he was noted to be arousable but confused. Dr. McFarland was notified and he was sent on 11/20/08 for a chest x-ray (negative). Michael Gardner was notified of the incident and he requested that his father be transferred from care of Dr. McFarland to Dr. Drexler. Dr. Drexler said that he could not take over care in an emergent situation and he was transferred to Dr. Henry.

3.14  The remainder of the month of November was basically the same as before. **Gardner remained difficult to arouse, required maximum assistance, his speech was impaired, he was lethargic, confused and disoriented and he was incontinent of bowel and bladder.**

3.15  <u>December, 2008</u>. During the month of December, 2008, Mr. Gardner continued to need assistance with eating and ambulating. There was a note that the staff was pushing him in his wheelchair. New orders were received for PT and OT. On 12/1/08, a new abrasion was noted on his left elbow measuring 4x6.5cm. This was probably the result of being in bed most of the time and from trying to upright himself or push himself up in the bed. **Strangely, the basic assessment for the month noted him to be fully continent of bowel and bladder—this is highly unlikely since he was wearing adult diapers and incontinent when he came back from the *Red River* facility**, plus he was not ambulating on his own or and not displaying ability to make rational decisions. OT was discontinued on 12/5/08 due to maximum potential being met at that time. No notes were made about the wound care that was given for the left elbow abrasion but on 12/8/08, it was noted that the elbow abrasion had improved. **He was also noted on 12/8/08 to be sleeping most of the time** and they were attempting to put him into a program called "Silver Spoons" that dealt with nutrition and feeding. A referral to speech therapy was also made on that day.

3.16  On 12/9/08, he was noted to have fallen out of his wheelchair again and now had a hematoma on his forehead and skin tear on his left hand measuring 2x1cm. **His fall risk was now noted at 15 (high risk).** A new order for Ritalin was given. Ritalin has been used in the past to bolster the effect of levodopa (the chemical that is lost with Parkinson's) in the brain. It is a stimulant, but also has the side effect of appetite loss. Since it is a stimulant, they were probably looking for a two-fold effect of

improving side effects of Parkinson's and making him more alert and less drowsy. A referral was made for rehabilitation screening because of very poor functional status.

3.17  Blood work that was performed on 12/10/08 showed low results in the following areas: hematocrit, hemoglobin, red blood count, potassium (very low), and total protein and albumin (indication of malnutrition). **His urinalysis came back showing E-coli and enterococcus—probably due to fecal cross-contamination from wearing a diaper.** So basically, at that point in time, Gerald Gardner was anemic, malnourished and had a bladder infection from what was probably poor bladder and bowel care.

3.18  There are reports on 12/10/08 and 12/12/08 of two additional falls. 12/10 – fall in room while standing next to dresser (Wanderguard reapplied at this time with alert alarm set); and 12/12 – fall in common area while trying to stand without assistance sustaining a 5cm laceration over his left eye/forehead. After the fall on 12/12/08, 911 was called to evaluate since he hit his head when falling. He was taken to the ER at *Christus Schumpert* and the laceration was sutured and he was discharged back to *Pierremont*. While at *Christus Schumpert*, a head CT was performed and showed cerebral atrophy and mild white matter microvascular ischemic changes most likely due to Parkinson's or small strokes. It was noted by the staff that he required continuous monitoring which should have been done for quite some time along with some type of restraint while sitting unsupervised in the wheelchair. He had been noted to be unsteady in his balance and gait for months and should not have been put into his bed without raising the siderails.

3.19  By 12/15/08, increased rigidity was noted by PT due to Parkinson's. The OT evaluation noted decrease in his functional ability, gross motor skills and sensation in his upper extremities.

3.20  There is a note on 12/18/08 that Gardner was alert and verbally responsive and making eye contact with the speaker. The notes indicate that he once again attempted to rise out of his wheelchair by himself—this note was likely written without really looking at the patient.

3.21  On 12/20/08, Gardner was noted to have gotten out of his bed, urinated on the floor and then lost his balance and (conveniently) fell back on his bed. This time he sustained a laceration over his left eye and was taken to "WKP" where it was sutured and he was returned to *Pierremont*. On 12/22/08, Mr. Gardner was reported to be trying to stand while his wheelchair was in the unlocked position.

3.22  One must wonder at what point was *Pierremont* going to place some restrictions on Colonel Gardner's ability to try to move about the unit whenever he wanted? He had repeatedly proven that he was unsteady and unbalanced and could not even take care of his ADLs without assistance. How

was he supposed to get in and out of his bed and his wheelchair without being monitored and assisted? *Pierremont* failed to provide supervision to protect Mr. Gardner from himself and the environment in which he lived. When an order was written for PT, OT or ST, when the therapist attempted to perform the activity, if Gardner, who was already diagnosed with cognitive disabilities, refused treatment, the therapists simply surrendered and failed to proceed with the treatment.

3.23  Mr. Gardner fell out of his wheelchair again on 12/28/08 while in the dining room. According to the note, he did not hurt himself and no abrasions were noted, but when he woke up the next morning, he complained of pain in his hip. He was sent for an x-ray.

3.24  **January, 2009.** A stage 2 pressure area was noted in Gardner's coccyx area on 1/7/09. A stage 2 pressure ulcer involves partial thickness skin loss involving the epidermis, dermis or both and is usually superficial and presents clinically as an abrasion, blister or shallow crater.

3.25  Gerald Gardner's son requested transfer to *Christus Schumpert Hospital* at that time. On admission to the hospital, Gardner was noted to have a high white count; low hematocrit, hemoglobin, potassium, and albumin; and high sodium and potassium. **Once again, indicating anemia and malnutrition.** Initial assessment included urinary tract infection, dehydration, diabetes mellitus – type 2 and gastroesophageal reflux disease (GERD). Gardner remained at *Christus Schumpert* until 1/14/09 where they determined that his **change in mental status was probably secondary to infection** and his Parkinson's was the cause of his advanced dementia. He was treated with IV antibiotics and started on supportive care and wound care. His condition improved overall and he was transferred to *Cornerstone Hospital* per request of son.

3.26  Mr. Gardner was a patient at *Cornerstone Hospital* from 1/14/09 to 2/19/09 under the care of Dr. Balogh. His admitting diagnosis included sacral and penile decubiti, urinary tract infection, dehydration, dementia, advanced Parkinson's, protein calorie malnourishment, GERD and chronic illness. *Cornerstone* personnel documented the genetalia infection and neglect.

3.27  A swallow evaluation was performed and showed signs and symptoms of aspiration when drinking thin liquids. Mr. Gardner had his up and downs while at *Cornerstone* and showed signs of improvement and alertness and verbalization. PT and OT were started around 1/22. On 1/26, Mr. Gardner did not have a good day and it was necessary to start him on IV feeding. He was in a state of severe protein calorie malnourishment and severe deconditioning.

3.28   **February, 2009.** Around the beginning of February, Gerald Gardner was starting to develop a lot of secretions requiring suctioning. A chest x-ray was performed but did not show that there had been any aspiration. A NG tube was inserted on 2/6/09 to provide a source of feeding. Gardner obviously did not like this and tried repeatedly to remove the NG tube. He was awake but confused during this period. Questionable pneumonia was diagnosed by chest x-ray on 2/8/09.

3.29   Dr. Balogh suggested the insertion of a PEG tube for feeding on 2/13/09 since Gardner repeatedly tried to pull the NG tube and was finally successfully doing so on 2/18/09. A PICC line was placed on 2/19/09 for IV access of fluids and antibiotics. Gardner's prognosis was noted to be poor. He had protein malnourishment which made it difficult to treat infections and his pressure ulcers. During his hospitalization at *Cornerstone*, he did not meet any of the goals set for him and his cognitive deficits made him unable to participate in his medical care. He was discharged to *Grace Home* on that date accompanied by his family.

## IV.

## NEGLIGENCE

4.01   Lieutenant Colonel Gerald Gardner died on February 27, 2009, after months of suffering the deficiencies in care at *Pierremont*, including, *inter alia*, the following non-exclusive areas of neglect, failures, acts and/or omissions that constituted a deviation from the accepted Standard of Care, which deviation(s) were a proximate and/or producing cause of Petitioners' damages:

- **Wound and Sore Treatment.** Failing to properly treat Gerald Gardner's wounds and sores.
- **Bowel and Bladder Neglect.** Failing to follow an appropriate bowel and bladder program when Gerald Gardner became incontinent;
- **Malnurishment.** Failing to provide additional protein and calorie nourishment to Gerald Gardner (they were reporting that he was eating almost 100% of his meals, but the truth shows a different story);
- **Disregarding Therapy Orders.** Giving up on the multiple therapy programs ordered for Gerald Gardner by the caring doctors (including OT, PT and ST);

- **Fall Risk Disregard**. Allowing Gerald Gardner to be a threat to his own safety by allowing him to be up ad lib and not securing him in his wheelchair and Geri-chair (if they had him in that type of chair);

- **Fall Risk Disregard**. Failing to take appropriate steps to assure that bedrails were up so that Gerald Gardner did not get up while he was confused and fall.

4.02   *Pierremont*'s disregard of Colonel Gerald L. Gardner's health, safety and dignity resulted in his long and unnecessary suffering, and contributed to his disgraceful death.

4.03   Petitioners aver that defendants were negligent under the circumstances and/or that his/their conduct fell below the applicable standard of care, as physicians and health-care providers generally, and particularly within his/her/their respective area(s) of specialization, as set forth above and any and all other ways which may be discovered and/or presented at trial.

V.

5.01   Petitioners, in accordance with Civil Code Article 2315, *et seq.*, assert the following non-exclusive claims against Defendant seeking all such reasonable damages in the premises:

(1)   SURVIVAL ACTION as provided by Louisiana Civil Code Article 2315.1 for damages to GERALD GARDNER before his death including physical pain and suffering, mental anguish, loss of mental and intellectual function, medical expenses and all other general and equitable relief;

(2)   WRONGFUL DEATH as provided by Louisiana Civil Code Article 2315.2 for damages including grief and mental anguish; loss of future support; loss of parental consortium, service, society, and companionship; emotional and mental trauma resulting from the contemporaneous perception of the death of their beloved father; reasonable funeral and burial expenses, paid or payable by survivors; and all other general and equitable relief;

VI.

6.01   Petitioners assert that R.S. 40:1299.47 *et seq.*, and all related statutes limiting the liability of healthcare providers are unconstitutional and invalid, and reserve all rights to challenge the Constitutionality, validity and enforcement of those statutes.  Participation in the statutorily required medical review panel process did not waive or abandon such rights.

VII.

7.01   Petitioners are entitled to damages for the items set forth above in such amounts as are reasonable in the premises, which damages are not less than Fifty Thousand and No/100 ($50,000.00) Dollars, entitling petitioners to a trial of this matter by jury.

WHEREFORE, Petitioners, MICHAEL GARDNER, individually and on behalf of his deceased father, GERALD GARNDER, and ANTHONY L. GARDNER, individually and OLIVIA GARDNER STANLEY, pray that this Petition for Damages be served on the named Defendant, and that after due proceedings are had, that there be judgment rendered in favor of the Petitioners, and against the Defendant herein NEXION HEALTH AT PIERREMONT, INC., also known as and operating as and through PIERREMONT HEALTH CENTER, in solido, for all damages reasonable in the premises together with legal interest thereon from the date of the filing of the Request for Medical Review Panel until paid, plus costs and attorneys fees, plus all cost and disbursements of these proceedings.

Petitioners further pray for all general and equitable relief as the nature of the cause may require.

Respectfully submitted:

*Maria B. Glorioso*

MARIA B. GLORIOSO (#24435)
VINCENT J. GLORIOSO, JR. (#6064)
VINCENT J. GLORISO, III (#26896)
**THE GLORIOSO LAW FIRM**
815 Baronne Street
New Orleans, LA 70113
Telephone: (504) 569-9999
Facsimile: (504) 569-9022
Attorneys for Petitioners

PLEASE SERVE:

NEXION HEALTH AT PIERREMONT, INC.
Through its registered agent for service of process
CT Corporation System
5615 Corporate Blvd., Ste. 400B
Baton Rouge, LA 70808

Louisiana Attorney General
James D. "Buddy" Caldwell
1885 North 3rd Street
Baton Rouge, LA 70802

ENDORSED FILED
ERIC BRUMLEY, Deputy Clerk

MAY 1 0 2012

A TRUE COPY - Attest
CADDO PARISH DEPUTY CLERK